319 A.2d 643.

RHODE ISLAND CONSUMERS' COUNCIL *vs.*
ARCHIE SMITH *et al.*

NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY *vs.*
PUBLIC UTILITIES COMMISSION.

MAY 24, 1974.

PRESENT: Paolino, Joslin, Kelleher and Doris, JJ.

DORIS, J. On April 16, 1971, the New England Telephone & Telegraph Company (the company) filed with the Public Utilities Commission (the commission) a revised telephone tariff designed to add approximately $14,-800,000 to its annual revenue. This action by the company was under authority of G. L. 1956 (1969 Reenactment) §39-3-11, as amended by P. L. 1969, ch. 240, sec. 5. The proposed tariff was suspended by the commission while investigation was made, and public hearings were held on the propriety of the proposed tariff changes. On

May 4, 1972, the commission filed its report and order rejecting the company's request for $14,800,000 additional annual income but allowing the company to file a modified rate schedule structured to increase revenues by approximately $7,989,000. From this order, both the Rhode Island Consumers' Council (the council) and the company, acting under authority of §39-5-1, as amended, commenced separate certiorari proceedings in this court to test the legality and reasonableness of the commission's decision and order. We consolidated the two petitions and, pending argument, denied the request (1) of the council for a stay of the commission's order permitting the company to file a modified revision of its rates; and (2) of the company for leave, pending final determination, to be permitted to operate on its proposed rate schedule. *Rhode Island Consumers' Council v. Smith,* 110 R. I. 910, 290 A.2d 617 (1972).

By decision dated March 28, 1973, this court remanded to the commission its report and order of May 4, 1972, directing the commission to:

> "* * * reconsider the testimony in the present record supplemented by such further testimony as may be offered pursuant to the petition of any party or by its own direction, and it should then make further findings and orders in harmony with this opinion. Any party thereafter dissatisfied may, by motion filed in this court within 20 days following the commission's action, bring the matter before us for further consideration. In that event it will be set down for argument upon the briefs now before us and upon such supplemental record and briefs as may be required. Jurisdiction for the review of the commission's supplementary decision and amended order is retained in this court." *Rhode Island Consumers' Council v. Smith,* 111 R. I. 271, 302-03, 302 A.2d 757, 775 (1973).

Both the company and the council filed petitions for leave to present additional evidence to the commission.

Both parties presented additional evidence which they were allowed to introduce into the record. The parties were also afforded an opportunity to present oral and written arguments on the issues. The commission, following hearings, issued a supplementary report and order on July 20, 1973, granting the company's proposed tariffs filed April 16, 1971, and designed to add $14,800,000 to its revenue. By motion dated July 26, 1973, the council moved in this court for further consideration of the commission's decision.

## WAGE AND FRINGE BENEFIT

In its original report and order, the commission allowed the company to include in its operating expenses only 5.5 percent ($568,000) of a 12.3 percent ($1,244,000) annual increase in wage and fringe benefits which the company has been paying to its employees in compliance with a collective bargaining agreement because of certain unidentified Presidential Price Commission regulations.

We remanded this question to afford the commission an opportunity to provide us with the pertinent regulations or, if the circumstances required, to alter its decision and order since the only potentially sound bases for the disallowance of the claimed operating expense were regulations which the commission had not identified. *Rhode Island Consumers' Council* v. *Smith, supra; United Transit Co.* v. *Nunes,* 99 R. I. 501, 504-05, 209 A.2d 215, 217-18 (1965).

The commission's supplementary report and order found that:

"* * * it is now clear that the limitation of 5.5% did not apply to wage increases contracted prior to November 8, 1971. The wage increases involved resulted from collective bargaining agreements entered into before that date, and accordingly, the full amount of such wage increases must now be reflected in our de-

cision. The same collective bargaining agreements also provided for increases effective in 1972 and scheduled in 1973 which are also unaffected by the 5.5% limitation. Subsequent phases of the Economic Stabilization Program appear to require restoration of the amounts we disallowed even if the wage increases had been pursuant to agrements entered into subsequent to November 8, 1971."

The council now argues that "[a]djustment for productivity improvements has been a continuing requirement of Price Commission Cost of Living Council regulations * * *. Accordingly, the commission's supplemental report suffers the same defect as the Court found in its original decision. That is, it has provided no specific basis for allowing the full amount of the claimed increase."

This court disposed of this contention in our earlier decision wherein we stated that while a utility rate increase may be permitted only if it reflects productivity gains, it is not mandated with respect to wage and fringe benefit increases and is without relevance in this proceeding. *Rhode Island Consumers' Council* v. *Smith, supra.* The council asked that the increase in wages be offset at least in part by the productivity gain attributable to that increase, but the commission found no probative evidence of any such gain and the council in its brief points to none.

The only potentially sound bases for the disallowance of this claimed operating expense were regulations which it is now apparent are non-existent. Thus, the commission's action in reversing its earlier partial disallowance of the company's wage and fringe benefit increases is in accord with the authorities and consistent with this court's mandate.

## PURCHASES BY THE COMPANY FROM WESTERN ELECTRIC

For many years Western Electric Company has virtually been the manufacturing department for American Tele-

phone and Telegraph Company affiliates and has supplied them with a major portion of their telephone equipment and supplies. *Smith* v. *Illinois Bell Tel. Co.*, 282 U.S. 133, 153, 51 S.Ct. 65, 70, 75 L.Ed. 255, 265 (1930); *Illinois Bell Tel. Co.* v. *Gilbert*, 3 F.Supp. 595, 602 (N.D. Ill. 1933). This relationship has often resulted in inquiries as to the fairness and reasonableness of Western's profits on its sale to those affiliates. The commission deducted $71,000 from the company's operating expenses.

This court's earlier decision required the commission to substantiate its deduction of $71,000 from the company's operating expenses for purchases by the company from Western Electric. Its sole substantiation for that deduction was found in the conclusory statement that " '* * * on the basis of what has been presented [that amount] appears to be fair under the circumstances.' " We stated that "[a]djustments in rate cases cannot rest on conjecture, and we therefore cannot permit the commission to 'roam the unfenced fields of speculation.' " *Rhode Island Consumers' Council* v. *Smith, supra,* quoting *St. Louis-San Francisco Ry.* v. *State Corp. Comm'n,* 187 Kan. 23, 27, 353 P.2d 505, 507 (1960). In its supplementary report and order, the commission eliminated its disallowance of $71,-000 from operating expenses pointing out that this merely meant that, "on this record, the Company's showing that such transactions and the prices it pays Western are reasonable has been demonstrated neither to be wrong, nor sufficient to persuade us to reach a contrary conclusion."

The company in its original testimony presented uncontradicted evidence that Western Electric's prices were substantially lower than the prices of other suppliers of the same products and that Western Electric's profits have been below those achieved by other large industrial corporations. This evidence satisfied the company's burden of showing the propriety of its transactions with Western

238

Electric. *See Smith* v. *Illinois Bell Telephone Co., supra* at 152-53, 51 S.Ct. at 70, 75 L.Ed. at 265; *City of Houston* v. *Southwestern Bell Telephone Co.,* 259 U.S. 318, 42 S.Ct. 486, 66 L.Ed. 961 (1922).

The council challenges this aspect of the commission's supplementary decision by reasserting its previous arguments made in support of the evidence it presented through its expert witness, Robert G. Towers. As this court has previously indicated, the commission considered the Towers' presentation and found there was insufficient basic data to warrant its adoption. The council contends that the commission erred because "it has failed to specify the evidence" upon which it relied in modifying its original decision. The council's argument ignores the direction of this court in the remand that the commission submit support, if support can be provided, for the limited disallowance it made in its earlier decision. The commission found that no such support exists in the record, and therefore properly eliminated its earlier disallowance.

## WORKING CAPITAL

" 'Cash working capital ordinarily is the amount of cash required to operate a utility during the interim between the rendition of service and the receipt of payment therefor. It is the blood stream that gives life to the physical plant and facilities of the enterprise.' " *Pittsburg* v. *Pennsylvania Public Utility Comm'n,* 370 Pa. 305, 309, 88 A.2d 59, 61 (1952). The interim period is known in the industry as the "lag."

At the prior hearing the company presented evidence showing that, on the average, it does not receive payment for its services until 64-65 days after rendition. It estimated that the amount of cash working capital required to meet operating expenses during that lag is $7,981,000 and included that amount in its rate base.

In its original report and order, the commission applied a "rule of thumb" approach and allowed in the company's rate base working capital in the amount of $4,814,000 based upon 45 days of operation and maintenance expenses plus average material and supplies for the test year, rather than the amount of $7,981,000 used by the company for a lag period of 64-65 days. We held that:

> "The commission's conclusion is unacceptable. Legal evidence, rather than a 'rule of thumb,' is the probative indicator of working capital requirements, and the commission, when it selected a 45 day lag for no other reason than because it had followed that practice in some other case or cases on different facts, deprived itself '* * * of the freedom to decide what was a just and reasonable * * * [result] base[d] on the facts in evidence before [it].' That freedom is 'important and indeed necessary to do justice.' " *Rhode Island Consumers' Council* v. *Smith, supra* at 289, 302 A.2d at 769; *Narragansett Electric Co.* v. *Kennelly*, 88 R. I. 56, 73, 143 A.2d 709, 719 (1958).

During the supplementary hearings there was additional direct testimony and cross-examination on the subject of the company's working capital requirements. Both the council and the company were in agreement that a lag study was the proper method of determing the company's working capital requirements. The company's witness submitted a voluminous and complex lag study which was accepted in all aspects by the council's witness except that there was total disagreement between the two on the treatment of the Rhode Island gross receipts tax. The commission took a very active part in cross-examination of both witnesses.

In its supplementary report and order, the commission decided:

> "There is no question that the Company is entitled to a working capital allowance in its rate base which incudes provision for the prepayment of the gross receipts tax. Prior to 1969, gross receipts taxes were

current, i.e., 1968 gross receipts taxes *accrued* during 1968 were paid during 1968, with a final reconciliation payment in March of 1969. Beginning in 1969, due to a change in the statute, gross receipts taxes began to be prepaid, with a three year period given to fully implement the prepayment schedule. Thus, in each of the years 1969, 1970, 1971, the Company was required to pay and paid approximately 33% more each year in gross receipts taxes than were accrued and recovered through rates. By January 1972, the Company had prepaid in cash one full years gross receipts taxes approximately one year before this amount had been or could have been charged to its cutomers. Where did the Company obtain the funds to meet this cash tax payment? Obviously, they had to obtain working capital. As long as the Company is permitted in any year to charge off through rates only the current year's gross receipts taxes, the Company will never recover through rates the additional year's taxes it paid over the 1969-1971 period.

"After considering the record of the supplementary hearings as well as the record of the prior hearing, we agree with witness Towers that the ultimate cost of state tax adjustment does bring those taxes to a current status. We accept his conclusion of a post-payment composite of 32.56 days, bringing the computation up to year-end 1972. However, one fact is also clear from the Company's testimony and that is that since rates are prospective in nature and are based on an historical test year, it is not possible for the Company to begin collecting revenues including the effect of this adjustment on January 1 subsequent to the test year. Under the most expeditious circumstances, it would still require until about April 15 before such rates could be implemented or 105 days after December 31. Therefore, after considering that fact, Mr. Towers' post-payment days of 32.5 converts to a prepayment of 72.5 days. Adjusting his exhibit RGT-3, pp. 1 and 2, for this change produces a composite lag day for expenses of 2.58 days. When we subtract this figure from the revenue lag, which both the Company

and Mr. Towers find as 47.90 days, produces a net lag of 45.32 days. While this slight difference from the 45 days that we used in our prior decision might call for an increase in the allowance of 32/100 of a day under the facts of this case, the effect of such an adjustment on the working capital allowance would be so small as to be hardly measurable. Thus, on the facts of this particular case, it is clear that our "rule of thumb" approach, by luck or otherwise, has produced a fair result, and we will continue to use the results of that method in our supplemental conclusions in this case."

A determination of the allowable amount of cash working capital is fact finding. And,

"In passing upon the legality and reasonableness of the commission's decision and order we do not engage in fact-finding. General Laws 1956 (1969 Reenactment) §39-5-3, as amended. That is the commission's role; ours is to determine whether the commission's decision and order are lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence and sufficiently specific to enable us to ascertain if the facts upon which they are premised afford a reasonable basis for the result reached." *Rhode Island Consumers' Council* v. *Smith, supra* at 277, 302 A.2d at 762. *Town of Jamestown* v. *Kennelly,* 81 R. I. 177, 180-81, 100 A.2d 649, 651 (1953).

We hold that the commission's findings are fairly and substantially supported by legal evidence.

The council contends that the commission's adjustment confuses the concepts of working capital and regulatory lag and is therefore improper, and that the 105 day lag is a one-time delay in effecting a rate change which has no relationship to the company's continuing requirements for working capital. This is simply not so. The 105 day lag which the commission is taking into consideration is the lag between the time of prepayment of the gross receipts tax and the time revenues containing an allowance for

that tax are received. There is no synchronization of revenues and expenses as claimed by the council, because that adjustment is not reflected in revenues received in the year in which the tax is paid. As long as the company is permitted in any year to charge off through rates only the current year's gross receipts tax, the company will never recover through rates the additional year's taxes it has paid over the 1969-1971 period.

## UNAMORTIZED INVESTMENT TAX CREDITS OF $1,856,028

In its original report and order the commission did not deduct the unamortized investment tax credit from the company's rate base. This court directed the commission to explain its reason for doing so. The commission in its supplementary report and order explained that:

"The investment credit established by the Revenue Act of 1962 was terminated on April 18, 1969. Since that date, however, the Company has continued to flow-through the benefits of prior credits under that Act, thus increasing earnings over the productive life of the plant giving rise to such credits. These amounts have been reflected in the Company's accounting exhibits and in our determination of the Company's allowable operating expenses and taxes. In our opinion, to both increase the Company's earnings by the amount of the annual amortization and decrease its rate base by the unamortized reserve would be contrary to the intent of the investment tax credit law. That intent was to encourage capital investment by providing the investor with a tax reduction to the extent that qualified investments were made. That intent was evidenced by a specific requirement in a 1964 amendment to the 1962 Revenue Act whereby federal regulatory bodies were forbidden from deducting the unamortized reserve from a utility's rate base. Although that prohibition did not specifically bar such deduction by a state regulatory body, similar credits under the 1971 Revenue Act (Job Develop-

ment Credit) are available to a public utility only if the federal or state regulatory body makes no rate base deduction for the unamortized reserve. We are convinced that the method we have used which results in a sharing of the benefits of the Investment Tax Credit by giving the consumer the benefit of the annual amortization and the Company the benefit of the use of the funds derived from the credit is a fair and reasonable approach to the treatment of this item."

The council argues that the commission's reasoning is defective for two reasons: (1) the customers are not benefited by the annual amortization because the amortization is a direct result of their having been charged with taxes higher than the actual tax paid in the first instance; (2) the company has the advantage of the cash generated through normalization even where the deferrals are deducted from the rate base. We do not agree.

The commission's proposed handling of this special tax deduction would have the effect of spreading the saving over the life of the article or the plant which gave rise to the tax saving, rather than applying it in full to the year in which the capital expenditure was made. We feel that the commission was correct in its treatment of the unamortized investment tax credit, as it benefits the consumer because the company's annual revenue requirements are reduced by the annual amortization of the tax credit reserve, and it benefits the company in that the company has capital available to it at zero cost.

## RATE OF RETURN AND ATTRITION

In its appeal to this court, the company argued that the commission's original report and order had not adequately considered the erosion or attrition of the return that it was experiencing, and that unless that attrition were recognized it would be impossible to earn the 8.38 percent which the commission found to be a fair rate of return. In our previous opinion, we stated that upon remand of the

case and the taking of further evidence, the commission would "* * * be in a position to make suitable adjustments which can reflect whatever erosive trends may be disclosed." *Rhode Island Consumers' Council* v. *Smith, supra.*

On remand, the commission received additional evidence through the company's witness which demonstrated that,

> "* * * the Company's earnings under the rates allowed by our Order of May 4, 1972 have been substantially below the level anticipated by that Order, and that on the basis of present facts an adjustment for attrition is warranted."

Among other things, the company's evidence showed that its actual 1972 earnings, based on the commission's original order and report, would produce a rate of return of 6.79 percent, mainly as a result of the spiraling rate of inflation.

The company attempted by its supplementary evidence to show the effect of what it considers to be adjustments required by this court's remand and further adjustments to place its 1972 results on an updated basis. On this basis, it arrived at adjusted 1972 earnings of $11,895,000, an average 1972 rate base of $170,175,000 and a rate of return of 6.99 percent. While the commission agreed that the 1972 figures must be looked at to see the effect in practice of the rates it allowed in May of 1972, it felt that the company had overstated the so-called "[c]ourt remand adjustments" by including an upward adjustment to its working capital. The commission felt that the supplemental record supported the result produced by its method. Therefore, it concluded that an average 1972 rate base for the company reflecting its conclusions pursuant to this court's decision was $167,155,000. Its 1972 earnings, based upon the commission's findings and conclusions in the supplementary report and order, and adjusted to give full annual effect to the increased rates previously allowed by the commission and the company's 1972 wage increases,

were $11,895,000. Relating these earnings to the 1972 average rate base produced a rate of return for the year 1972 of 7.12 percent. This shows that in 1972 the company's revenues were at an annual level approximately $4,465,000 under the amount necessary for it to achieve the 8.38 percent rate of return the commission and this court found to be fair and reasonable. It was also clear to the commission that this erosive trend was likely to continue. To offset such erosion so that it will at least for the immediate future have an opportunity to earn the allowed rate, the company contends that an earnings trend adjustment of $2,792,000 in revenues above and beyond the $4,465,000 referred to above is required. This conclusion was based upon a comparison of the year 1972's results with those for the test period used on a comparable basis in the commission's original report and order, as a means of measuring the rate of erosion. That rate was then applied to the 1972 average rate base to determine the revenue effect. After considering that evidence and the prior evidence as to the company's experience following the increase that took effect in February 1970, the commission was of the view that the company's approach to this question had produced a reasonable result. The commission was also mindful that the company's construction program was expected to continue at a high level, and that it was already committed by its 1971 collective bargaining agreement to further wage increases.

The adjustment, together with the $4,465,000 deficiency during the adjusted year 1972, indicated that on a current basis the company would be entitled to additional annual revenues of approximately $7,250,000 or substantially more than the full effect of the tariffs if allowed in their entirety. Under those tariffs, after deduction of the increases already allowed by the commission's original order and report, a maximum additional revenue increase of

$6,777,000 could be produced based upon 1972 volumes of business. That is a difference of nearly $500,000. However, the commission decided to allow the company no more than it originally asked for. Its supplemental order allowed the company to place in effect its tariffs filed April 16, 1971.

The council argues that the commission went far beyond this court's mandate:

"It went far beyond restoring the Company's 1972 earnings to the 8.38 percent allowable rate of return. First, it entertained and used data provided by the Company reflecting not its actual 1972 rate of return but rather its pro forma rate of return (after annualization of wage increases) for the year 1972 to determine an additional revenue requirement of $4.5 million. Second, it added an additional $2.8 million to offset an adverse earnings trend, i.e., assuming further erosion beyond pro forma 1972. This amount was developed in supplemental Company testimony and reflects *for a second time* the deficiency in the 1972 pro forma rate of return. Another way of looking at it is that this earnings trend adjustment represents the erosion occurring between the test year ended August 31, 1971, and calendar 1972 or approximately 1½ years experienced "erosion." In the view of the Consumers' Council, this portion of the attrition adjustment clearly double counts the experienced erosion is [sic] an obvious violation of the prohibition against inflationary expectations."

The council's argument disregards the purpose of a test period in rate making and does not recognize that rates are made for the future. The use of 1972 or any other period as a test year in determining rates is only meaningful if the test year results are adjusted so as to make them as reasonably indicative as possible of the results anticipated, at least for a reasonable period of time after the effective date of the revised rates. Rates cannot be made retroactive to the year 1972.

The council's argument further ignores this court's direction that the commission recognize erosive trends in determining the relief to be allowed the company, and the commission had before it substantial evidence that an erosive trend in the company's rate of return had continued since its original report and order. Furthermore, the council submitted no evidence to the commission, and no evidence exists in the record, contradicting this evidence of erosion.

The company by testimony and exhibits at both the original and supplementary hearings presented alternative methods of compensating for such erosion. We have recognized that the commission has discretion in the selection of a method for compensating for erosion.

The evidence in this proceeding supports the method adopted by the commission as a reasonable method for achieving a just and reasonable result and will not be disturbed.

In each case, the records certified to this court are ordered returned to the Public Utilities Commission. The decision of the commission as modified by the supplementary report and amended order is affirmed. The commission is directed to issue the orders necessary to carry out its order in conformity with this opinion.

Mr. Chief Justice Roberts did not participate.

*Roberts & Willey Incorporated, Dennis J. Roberts, II,* for Rhode Island Consumers' Council, *Tillinghast, Collins & Graham, Andrew A. DiPrete, Peter J. McGinn, Robert G. Bleakney, Jr.,* Boston, Mass., for New England Telephone & Telegraph Company, for plaintiffs.

*Archie Smith,* pro se.