**TOWN OF NEW SHOREHAM**

v.

**RHODE ISLAND PUBLIC UTILITIES COMMISSION et al.**

No. 81–207–M.P.

Supreme Court of Rhode Island.

Aug. 10, 1983.

William J. Gallogly, Town Sol., John M. Roney, Mann & Roney, Providence, for petitioner.

Lawrence Pomeroy, pro hac vice.

Peter J. McGinn, Tillinghast, Collins & Graham, Peter V. Lacouture, Tillinghast, Collins & Graham, Providence, Michael R. Postar, Cranston, for Public Utilities Com'n.

## OPINION

BEVILACQUA, Chief Justice.

This is a statutory petition for certiorari brought by the town of New Shoreham (the town) pursuant to the terms of G.L. 1956 (1977 Reenactment) § 39–5–1. The town filed the petition seeking review of a decision and order entered by the Public Utilities Commission (the commission) on docket No. 1517. Block Island Power Company (the company) filed a tariff on June 13, 1980, seeking to generate additional annual revenue of $80,000.[1] The commission suspended the effective date of the tariff and assigned the matter for public hearings and investigations. The commission subsequently held eight public hearings.

At the hearing on October 31, 1980, the Division of Public Utilities (the division) moved pursuant to G.L. 1956 (1977 Reenactment) § 39–3–32 for disallowance of payments for fuel that the company purchased under a contract with Island Services, Inc. (Island Services). The division maintained that the company and Island Services were affiliates as defined by § 39–3–27 and that substantial evidence existed which established that the terms of the existing fuel contract between them was unreasonable. The commission did not immediately rule on the motion.

On March 31, 1981, the commission issued its decision and order in which it granted the company's tariff. The commission ordered in part that it would consider the

---

1. The company filed an additional request for emergency rate relief in the amount of $37,000 (docket No. 1516). The commission denied the request on January 27, 1981. This matter is not in issue.

company's fuel adjustment clause in an on-going generic docket (docket No. 1416), that the company must report on a quarterly basis regarding the recovery of the wind-turbine and cable-television costs, and that all motions inconsistent with the findings and conclusions therein are denied.

The town raises the following issues on appeal:

1. Whether the commission unlawfully failed to scrutinize closely the fuel price contract between the company and its affiliate Island Services and the revenue received by the company from Island Services relating to its fuel storage and supply system.

2. Whether the commission erroneously made the production of financial information for Island Services subject to a protective order.

3. Whether the commission erred in allowing as a proper operating expense (*a*) a salary of $18,000 for the president of the company and (*b*) a $12,000 annual fee paid to the former president of the company pursuant to a contract with the present owner.

4. Whether the commission erroneously approved the company's recovery of wind-turbine expenses through the fuel-adjustment clause.

5. Whether the commission unlawfully failed to reduce the company's cost of service by a portion of pre-1972 contributions in aid of construction.

■ The controlling principles of appellate review in a public utility rate case have been summarized in several recent opinions of this court. *See New England Telephone & Telegraph Co. v. Public Utilities Commission,* 116 R.I. 356, 362–63, 358 A.2d 1, 7 (1976); *Rhode Island Consumers' Council v. Smith,* 111 R.I. 271, 277, 302 A.2d 757, 762–63 (1973). This court does not sit as a factfinder; our role is "to determine whether the commission's decision and order are lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence and substantially specific to enable us to ascertain if the facts upon which they are premised afford a reasonable basis for the result reached." *Rhode Island Consumers' Council v. Smith,* 111 R.I. at 277, 302 A.2d at 762. However, if the commission fails to set forth sufficiently the findings and the evidentiary basis upon which it rests its decision, we shall not speculate thereon or search the record for supporting evidence or reasons, nor shall we decide what is proper. Instead, we shall remand the case in order to provide the commission an opportunity to fulfill its obligations in a supplementary or additional decision. *Id.* at 278, 302 A.2d at 763.

## I

The town asserts that the commission erred in failing to determine the reasonableness of the fuel-price contract and the rental revenue received by the company for Island Services's use of its fuel storage and supply system. The basis for the town's position is that because the company and Island Services are affiliates, the transactions between them are not negotiated at arm's length and thus the price paid for fuel is excessive.

When a utility and its supplier are both owned and controlled by the same entity, "the safeguards provided by arm's-length bargaining are absent, and ever present is the danger that the utility will be charged exorbitant prices which will, by inclusion in its operating costs, become the predicate for excessive rates." *General Telephone Co. of N.Y., Inc. v. Lundy,* 17 N.Y.2d 373, 378, 218 N.E.2d 274, 277, 271 N.Y.S.2d 216, 220 (1966). Rhode Island General Laws specifically empowers the commission with far-reaching authority to investigate transactions among public utilities and their affiliates. A public utility must file with the division any contract or agreement over $500 with an affiliate within ten days after execution; failure to file renders the contract or agreement unenforceable. Sections 39–3–28 and –29. The division may require a public utility to file full information with respect to any purchase from or sale to an affiliate. Section 39–3–28. In addition, the

division has full authority to investigate any contract or agreement with an affiliate and to make any reasonable order relating thereto in the public interest; failure to satisfy the division of the reasonableness of any such contract or agreement empowers the division with the authority to disapprove the contract or agreement, or disallow payments thereunder. Section 39–3–30. Moreover, the division has the power in any rate proceeding to disallow payments to affiliates under an existing contract or arrangement unless the public utility has established the reasonableness of such payment. Section § 39–3–32.

■ When operating expenses arise out of dealings between affiliates, the commission has the right and duty to scrutinize closely such transactions. *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 116 R.I. at 379, 358 A.2d at 15 (citing *Northwestern Bell Telephone Co. v. State,* 299 Minn. 1, 22, 216 N.W.2d 841, 854 (1974)). In *Rhode Island Consumers' Council v. Smith,* 113 R.I. 232, 237–38, 319 A.2d 643, 646 (1974), this court stated that the New England Telephone and Telegraph Company had satisfied its burden of satisfying the propriety of its transactions with the Western Electric Company (an affiliate) by presenting evidence that Western's prices were substantially lower than the prices charged by other suppliers of the same product and that Western's profit levels were lower than those obtained by other large manufacturing concerns. *Accord, New England Telephone & Telegraph Co. v. Public Utilities Commission,* 116 R.I. at 378–79, 358 A.2d at 15; *see Smith v. Illinois Bell Telephone Co.,* 282 U.S. 133, 152–53, 51 S.Ct. 65, 70, 75 L.Ed. 255, 265 (1930), *on remand sub nom. Illinois Bell Telephone Co. v. Gilbert,* 3 F.Supp. 595, 602–03 (N.D.Ill. 1933), *rev'd on other grounds sub. nom. Lindheimer v. Illinois Bell Tel. Co.,* 292 U.S. 151, 175, 54 S.Ct. 658, 668, 78 L.Ed. 1182, 1196–97 (1934); 1 Priest, *Principles of Public Utility Regulation,* 104–05 (1969). In *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 116 R.I. at 378–79, 358 A.2d at 15, this court rejected the adoption of the "California approach" in the Bell system rate cases as a method of evaluating the reasonableness of Western Electric Company's prices. This approach, as compared with the traditional approach utilized by the court, determines the reasonableness of an affiliated transaction by treating the subsidiary as a part of the utility for ratemaking purposes. *See City of Los Angeles v. Public Utilities Commission,* 7 Cal.3d 331, 344, 102 Cal.Rptr. 313, 323, 497 P.2d 785, 795 (1972); *Pacific Telephone & Telegraph Co. v. Public Utilities Commission,* 62 Cal.2d 634, 661–62, 44 Cal. Rptr. 1, 18, 401 P.2d 353, 370 (1965); *Pacific Northwest Bell Telephone Co. v. Sabin,* 21 Or.App. 200, 222, 534 P.2d 984, 995 (1975). *See generally Re Washington Water Power Co.,* 44 P.U.R. 4th 27, 30–31 (Idaho 1981) (commission utilized "California approach" because unable to determine the reasonableness of fuel price based on a comparison of prices or affiliate profits with those of nonaffiliates; geographic location, lack of reasonableness standard in contract, and absence of industry norm were determinative factors).

It is clear from the testimony adduced at the hearing that Franklin Renz (Renz) is president, chairman of the board of directors, and majority stockholder of the company. Renz is also the owner of Island Services. Island Services purchases and supplies fuel to the company, lends money to the company at 2 percent over prime rate, leases the company a computer, utilizes the services of company employees, and shares some bookkeeping services. Island Services's sole asset is its inventory. It has no physical plant, and it utilizes the fuel-handling equipment owned by the company. Island Services pays the company a royalty of two cents per gallon on oil not sold to the company and an additional amount for rent of office space and other services.

The commission stated in its decision that the town and the division elicited extensive testimony concerning the reasonableness of

the transactions between the company and Island Services. However, the commission's decision and order did not set forth any discussion of this relationship or elaborate on its denial of the division's motion of October 31, 1980, to disallow payments for fuel made pursuant to a contract between the company and Island Services. (The commission held a hearing on May 12, 1981, concerning the company's ongoing generic docket (No. 1416) and stated that the issue of fuel cost was addressed by the commission and denied in its previous order and decision when it stated that all motions inconsistent with the order were denied.)

The propriety and reasonableness of the relationship between the company and Island Services has been at issue before the commission in docket Nos. 1166 and 1177. Examining their relationship, the commission found in its order and decision of October 9, 1975, that the intercompany transactions were reasonable. Noting the advantages to the company from Island Services's buying position in the market, the commission stated that the result of these transactions were equitable to both companies and the ratepayer.[2] Concerned that no contractual basis for the price of fuel which the company pays to Island Services existed, the commission directed the company to work with the division and develop a reasonable contract for transactions between itself and Island Services. It is apparent that successive contracts have been drawn up in accordance with the order in docket

Nos. 1166 and 1177 and that these contracts are filed consistently with the division.

The latest fuel contract between the company and Island Services was entered into on June 1, 1980. The new contract provides for a price that is adjusted not more often than once a month according to a formula provided in the contract. The formula specifies that

"[t]o the wholesale price of product (f.o.b. Providence) add the average transportation costs of product (per gallon) to Block Island at the then current rates and multiply the total by a factor which is the sum of (i) one-quarter of two percentage points above the [p]rime [r]ate of [i]nterest as established by the Connecticut Bank and Trust as of the date of the recalculation (expressed as a decimal), and (ii)1.15."

It was in docket No. 1517 that the commission had the first opportunity to review the provisions in the contract between the company and Island Services which defined fuel costs.

■ It is evident from the order and decision that the commission did not set forth sufficiently the findings and the evidentiary facts upon which its decision rested.[3] Moreover, the commission had a duty to scrutinize closely any transactions between affiliates. Thus, it is impossible for this court to fulfill properly its assigned function, and a remand for a supplemental decision is necessary. *See Rhode Island Consumers' Council v. Smith*, 111 R.I. at 277–78, 302 A.2d at 762–63.

---

**2.** In 1975 Mr. Henry Hutchinson was president and general manager, a member of the board of directors, and principal stockholder; Renz was the next largest stockholder and was in the process of acquiring control of the company from Hutchinson. Hutchinson also had a substantial interest in Island Services. Island Services had the same relationship with the company in 1975 that it has now.

**3.** The company maintains that the expenses and income related to the fuel storage and supply system were not at issue in the case because all parties to the proceeding stipulated that

"3) The investment in the fuel handling system shall be allocated thirty percent (30%) to non-utility operations and seventy percent (70%) to utility operations.
" * * *
"5) The fuel handling royalty paid by Island Services shall be deducted from the [c]ompany's revenue.
"6) The depreciation of the fuel handling system shall be allocated as in No. 3, above."
However, the function of the stipulation was to arrive at test-year adjustments in the ratemaking process and not to remove from consideration the issue of the reasonableness of the revenue received for Island Services's use of the company's fuel storage and supply system.

## II

The town asserts that the commission's protective order prevented it from investigating Island Services's profit levels and deprived it of a meaningful public hearing as provided by statute. The town does not maintain, however, that the issuance of the protective order prejudiced its case but that the commission violated some right to have the information made public. The town's argument is unpersuasive and unsupported by case or statutory law.

During the hearings, the town requested a copy of Island Services's income tax returns and financial statements for a six-year period. The company filed written objections with the commission. Recognizing the town's need for access to the information and citing the possibility that disclosure of Island Services's financial information would impair its financial integrity and undermine its ability to serve the company, the commission issued a protective order. The commission concluded that "a protective order would satisfy the needs of Island Services and afford the [t]own a full opportunity to present its position." The order specified in part that if "it should become necessary to use the [c]onfidential [i]nformation as evidence * * *, it will be placed in the sealed record * * * and shall be offered in an *in camera* hearing * * *. Similarly, cross-examination on or using [c]onfidential [i]nformation shall be conducted *in camera*." In a supplemental order, the commission clarified its original protective order by stating that the order applied to the tax returns of Island Services for six years and to the test-year financial report of Island Services. In a second supplemental order, the commission denied the town's motion for reargument and stated that "[t]he protective order does not make ineffective the [t]own's ability to present its case or pursue its remedies."

█ It is clear that in issuing its protective order, the commission carefully balanced the town's need for access to the financial and tax information of Island Services against the company's need for protection against impairment of Island Services's financial integrity "through the indiscriminate release of sensitive financial data." The protective order sought to protect the confidentiality of the requested documents through the use of in-camera proceedings. It did not prevent the town from using the information before the commission subject to the limitations set out in the order. Moreover, the protective order did not deprive the town of a meaningful public hearing or of some right to have the information made public. *See* G.L. 1956 (1979 Reenactment) §§ 38-2-2(a), (d)(2), (d)(15), as amended by P.L. 1982, ch. 416, § 1 (public's right to access to records pertaining to policy-making responsibilities of public body does not include (*a*) commercial or financial information obtained from a person or corporation which is of a privileged nature and (*b*) all tax returns).

## III

### A

The town next argues that the commission erred in allowing as a proper operating expense a salary of $18,000 for Renz as president of the company. Maintaining that Renz was a part-time executive whose services were not essential to the company, the town asserts that the commission could not have concluded that the salary was reasonable. Moreover, the town alleges that the commission did not closely scrutinize the Renz salary.

The commission stated in its order and decision that when an officer of a company is a controlling stockholder and a member of the board of directors, the commission must closely scrutinize the level of executive compensation awarded. Noting the fact that Renz makes a significant commitment to the company that is reflected in the amount of time he spends on Block Island and in contact with the employees of the company, the commission concluded that his salary was commensurate with his part-time status and was reasonable. The commission based its finding on the facts that

the record contained no information concerning Renz's income from sources beyond the company and that in 1978 the prior president received a salary of $24,000 for full-time employment. Because the division's witness testified that a salary between $25,000 and $30,000 was reasonable for a full-time position for the year in question, the commission reasoned that a salary of $18,000 was reasonable for part-time status.

Ordinarily, the determination of the level of executive compensation is within the discretion of management, and the commission should not interfere with that decision "absent evidence tending to prove that the projected expenditures unreasonably and unjustly affect the fare-paying public." *United Transit Co. v. Nunes,* 99 R.I. 501, 512–13, 209 A.2d 215, 222 (1965). However, in a rate proceeding involving affiliated interests, the commission has a duty to scrutinize closely any contract or agreement. *See New England Telephone & Telegraph Co. v. Public Utilities Commission,* 116 R.I. at 379, 358 A.2d at 15 (citing *Northwestern Bell Telephone Co. v. State,* 299 Minn. 1, 21–22, 216 N.W.2d 841, 854 (1974)). An affiliate is defined in § 39–3–27 as including "[e]very person owning or holding, directly or indirectly, ten percent (10%) or more of the voting capital stock of a public utility." Thus, Renz is an affiliate as defined under § 39–3–27, and the commission recognized its duty to scrutinize closely his salary with the company. The inherent danger in a situation like this—in which the president of the company is also the chairman of the board of directors and majority shareholder—is that there is no group of independent board directors answerable to stockholders who will ensure that salaries will bear a reasonable relationship to services performed on behalf of the company. Thus, salaries can take the form of concealed profits. *See* Welch, *Preparing for*

*the Public Utility Rate Case,* 210, 224–25 (1954).

We cannot conclude that the commission erred in allowing $18,000 as an operating expense. The commission recognized its duty to scrutinize closely the salary of Renz, and moreover, the evidence fully supports the commission's conclusion that the value of Renz's services was commensurate with the salary he received.

**B**

The town asserts that the payments of $12,000 per year to Hutchinson [4] under a stock-purchase agreement were not pension payments but were in reality stock-purchase payments for which the ratepayers received little or no value. Moreover, the town questions whether the payments are a consulting salary because the agreement provides that Hutchinson is to receive payment regardless of whether or not he performs any services for the company.

Section 39–3–27 states in part that an affiliate is "[a]ny person with whom a public utility has a management or service contract or arrangement of the character set forth in § 39–3–28, including contracts for personal services with persons not otherwise affiliated." The type of contract or arrangement set out in § 39–3–28 is one "which exceeds five hundred ($500) * * * entered into between a public utility and an affiliate providing for the furnishing of * * supervisory * * * or any other services." The company's agreement with Hutchinson must be classified as a transaction with an affiliate, and therefore the commission had a duty to scrutinize the agreement closely. It is evident from the lack of findings on the commission's part that it did not do so.

As a general rule, employee pension plans are properly includable as an operating expense. 1 Priest, *Principles of Public Utility Regulation,* 108–09 (1969); Welch, *Preparing for the Utility Rate Case,*

---

**4.** Hutchinson was the president and majority stockholder before Renz's acquisition of the company; he was also the previous owner of Island Services. Hutchinson effectively retired from the company in 1978 upon completion of the sale to Renz.

225 (1954). It cannot be gainsaid that social and economic advantages of pensions for superannuated employees exist. The commission should treat these expenditures as proper operating expenses because "the benefits which the company obtains from a pension plan in freeing the lines of promotion, and improving the morale and efficiency of employees, necessarily result in definite though indirect economic benefit to the company's subscribers." *Re Southern Bell Telephone & Telegraph Co.,* 92 P.U.R. N.S. 335, 346 (Fla.1952). *See generally Re Utility Employee Pension Costs,* 93 P.U.R. N.S. 159, 160 (N.Y.1952). However, it is apparent that gifts to executives and employees disguised as pension payments are not recognized as proper operating expenses. *See Re Orange & Rockland Electric Co.,* 49 P.U.R. N.S. 257, 298 (N.Y.1943). Similarly, when a company has no established policy governing pension payments and payments are made within the discretion of the board of directors, the commission should not recognize the payment as an operating expense.

The commission found the Hutchinson payment allowable as an operating expense because it was a pension payment. The commission expressly stated, however, that the company maintained no retirement or pension plans for its employees. Moreover, the agreement between Hutchinson and the company stated that the payment was a consulting fee. The payment cannot be classified as a pension payment, and the commission, on remand, must closely scrutinize the consulting-fee payment and determine whether or not it is properly includible as an operating expense.[5]

## IV

The town next argues that the commission erred in allowing the company to re-cover expenses incurred in constructing a wind-turbine generator and a cable-television system by means of the company's retention of the fuel savings it derived from wind-generated electricity. Specifically, the town asserts that the company did not present sufficient documentation of its construction costs and that the company's fuel-cost adjustment charge should take into account the portion of electricity generated by the wind turbine.

The commission ordered the company to report on a quarterly basis the amount of savings from the wind turbine. In addition, the commission stated that the issue of the future treatment of savings from wind-generated electricity would be decided at a later proceeding in the company's generic fuel docket.

Renz testified that the company spent $34,900 on the wind-turbine system and on the cable-television system. These figures appeared on the financial statements filed by the company. Moreover, the company accountant confirmed these figures and stated that these items were "below the line" expenses and not included as operating expenses. The town maintains that this evidence did not verify the company's claim and that the commission should have required an audit and specifically found in its decision that this amount was reasonable and proper. However, there is no logical reason for this court not to assume that the commission did not adopt this evidence as a sufficient indication of the company's expense. *See generally, New England Telephone & Telegraph Co. v. Public Utilities Commission,* 116 R.I. at 363, 358 A.2d at 7.

The commission permitted the company to maintain its present fuel-adjustment clause, thereby permitting the compa-

---

5. The company argues that because the agreement was approved by the administrator of the division of public utilities, the commission was without authority to determine whether the payment was properly included as an operating expense. The company overlooks the fact that the commission has exclusive jurisdiction to determine the rates of public utilities. General Laws 1956 (1977 Reenactment) § 39–1–3, as amended by P.L.1980, ch. 335, § 6. Inherent in any rate proceeding is the question of what expenses are properly included as a utility's operating expense. Furthermore, the town did not acquiesce in the administrator's approval and it is considered an aggrieved party under § 39–5–1 with the right of appeal.

ny to retain its fuel savings from the electricity generated by the wind turbine. As the company came close to recouping its investment, the commission stated that it would consider the future treatment of savings in the company's ongoing fuel-adjustment-clause docket. There is no evidence that satisfies this court that the commission acted illegally, arbitrarily, or unreasonably. *See Narragansett Electric Co. v. Burke,* R.I., 404 A.2d 821, 825–26 (1979), *cert. denied,* 444 U.S. 1079, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980); § 39–5–3.

## V

The remaining issue concerns the treatment of contributions in aid of construction. The town argues that the commission erred in refusing to deduct from operating expenses the amount of pre–1972 contributions in aid of construction not refunded to ratepayers.

The company will not pay the costs of extensive construction involved in providing service to a customer who lives beyond its existing lines. The customer who seeks electric service must advance to the company the construction costs necessary for interconnection. This advance is a contribution in aid of construction that is amortized over a period of time. However, pre–1972 contributions have not been amortized. At the hearing, the division's witness proposed that the pre–1972 contributions in aid of construction be deducted from the rate base and that the company's operating expense be "credited" with 10 percent of this amount annually for ten years. The commission stated that the company had not eliminated $47,373 from the rate base. Initially, it noted that this amount reflected the difference between the total pre–1972 contributions and the amount of contributions not yet depreciated. The commission stated that "[c]ontribution advances are not an investment of stockholders upon which depreciation is permitted." Finding that the company had "already taken depreciation on $47,373 of pre–1972 contributions," the commission held that an adjustment

was necessary for this amount. Thereafter, the commission, in discussing the operating expenses of the company, stated that the division's basis for crediting $47,373 to the company's cost of service was that the company should not have depreciated this amount in the first place. The commission concluded that a "$4,737 credit [for a ten-year period] would be an improper exercise in retroactive ratemaking." However, the commission credited the company with the amount of $4,737 in its computation of the revenue requirement.

The exclusion from rate base of contributions in aid of construction is uniformly accepted. *Ohio Utilities Co. v. Public Utilities Commission,* 58 Ohio St.2d 153, 160, 389 N.E.2d 483, 488 (1979); 1 Priest, *Principles of Public Utility Regulation,* 177 (1969). The reason is that shareholders' investments constitute rate base. If ratepayer contributions were included within rate base, then stockholders would be receiving a return on nonshareholder (noninvestor) contributions. Ratepayer contributions are devoted to the public use for their own benefit, not the investors' benefit. *Ohio Utilities Co. v. Public Utilities Commission,* 58 Ohio St.2d at 161, 389 N.E.2d at 488.

The Rhode Island Public Utilities Commission has held that a utility is not entitled to depreciate contributions in aid of construction. *Re Wakefield Water Co.,* 32 P.U.R. 4th 476, 486 (R.I.1980); *accord Re Crestview Services, Inc.,* 48 P.U.R. 4th 688 (Md.1981) (abstract); *Re Molokai Electric Co.,* 40 P.U.R. 4th 640 (Hawaii 1981) (abstract); *Re Camden & Rockland Water Co.,* 37 P.U.R. 4th 595 (Me.1980) (abstract). *Contra Re Elizabethtown Water Co.,* 38 P.U.R. 4th, 591 (N.J.1980) (abstract); *Re Consolidated Gas Electric Light & Power Co.,* 61 P.U.R. N.S. 94, 101 (Md.1945). The reason is that ratepayers should not be required to incur depreciation costs for capital they contributed. However, if the company amortizes the costs contributed by the ratepayer, then the company should be allowed to recover its investment through deprecia-

tion. *See Re Wakefield Water Co.*, 32 P.U.R. 4th at 486.

 The company's financial statement lists the pre–1972 contribution in aid of construction costs as a liability. Thus, it appears that the commission mistakenly treated the pre–1972 costs as representing an amount that the company had depreciated. Because the commission's findings were unsupported by legal evidence, a remand for a supplemental decision on this issue is required.

The records certified to this court are ordered returned to the commission. The commission should reconsider the present record as supplemented by such further testimony as it shall deem necessary. It should then make further findings and issue a supplemental decision and amended order in harmony with this opinion. Any party thereafter dissatisfied may, by motion filed in this court within seven days following the commission's action, bring the matter before us for further consideration. Jurisdiction for review of the commission's supplemental decision and amended order is reserved by this court.