OHIO UTILITIES COMPANY, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

(No. 78-849—Decided May 16, 1979.)

154

Messrs. *Vorys, Sater, Seymour & Pease, Mr. Sheldon A. Taft,* and *Mr. Richard J. Giovanetti,* for appellant.

*Mr. William J. Brown,* attorney general. *Mr. Marvin I. Resnik, Mr. Thomas L. Mumaw, Mr. Kevin F. Duffy* and *Ms. Judith B. Sanders,* for appellee.

*Mr. William A. Spratley,* consumers' counsel, *Mr. Orla E. Collier* and *Mr. John Hopkins,* for intervenor appellee.

SWEENEY, J. Ohio Utilities raises 14 propositions of law in this appeal, some of which involve discretionary decisions by the Public Utilities Commission. For the sake of brevity, we will limit our discussion to the five most significant issues.

## I.

Appellant first challenges the authority of the commission to proceed with the instant investigation as it did. In initiating this investigation, appellee based its authority on R. C. 4905.26, which states, in pertinent part:

"Upon complaint in writing against any public utility by any person, firm, or corporation, *or upon the initiative or complaint of the public utilities commission,* that any rate, * * * rendered, charged, demanded, * * * or exacted, is in any respect unjust, unreasonable, unjustly discriminatory, unjustly preferential, or in violation of law, * * * if it appears that reasonable grounds for complaint are stated, the commission shall fix a time for hearing, * * *." (Emphasis added.)

Ohio Utilities alleges that the commission improperly used that provision to alter its January 18, 1977, rate order for appellant. It is appellant's view that the only statutory provision which would authorize the commission to alter a prior rate order is R. C. 4909.15(E).[1] Since that section requires that there be an application by a person or public utility before the commission can alter or amend an order fixing a rate, Ohio Utilities contends that appellee is without authority to investigate, on its own initiative, existing rates, if it thereafter orders new rates. However, in addition to misconstruing the instant investigation as an attempt by appellee to alter its prior rate order, appellant interprets R. C. 4905.26 too narrowly. In discussing that provision this court has previously stated that, "[t]his language is extremely broad, and would permit what might be strictly viewed as a 'collateral attack' in many instances." *Western Reserve Transit* v. *Pub. Util. Comm.* (1974), 39 Ohio St. 2d 16, 18. While R. C. 4905.26 was invoked in that case by a complaint filed by a utility, rather than upon

---

[1] R. C. 4909.15(E) states, in pertinent part:

"Upon the application of any person or any public utility, * * * the commission may rescind, alter, or amend an order fixing any rate, fare, toll, charge, rental, classification, or service, or any other order made by the commission."

the initiative of the commission, our interpretation of the statute is still persuasive.

Appellant's limiting construction of R. C. 4905.26 strips it of its usefulness. If, after an investigation and hearing pursuant to this statute, the commission determines that existing rates are unjust or unreasonable, it must follow that the commission can then remedy the situation by ordering that new rates be put in effect. In *Ohio Bell Telephone Co.* v. *Pub. Util. Comm.* (1969), 17 Ohio St. 2d 45, we suggested the use of an R. C. 4905.26 hearing as a method whereby the commission could review the reasonableness of a rate schedule it was required to initially accept. In responding to the contention that, by being forced to accept schedules filed by the utility, a method would exist for the utility to exact exorbitant rates from its customers, we stated, at page 48, that, "[t]he consumer is protected from an unjust or unreasonable rate for such new service by Section 4905.26, Revised Code, which provides that such proposed rate may be reviewed by the commission upon a complaint by any person, or upon the initiative or complaint of the commission itself." Implicit in that statement is the conclusion that the commission could adjust any rates it found to be unjust or unreasonable.[2] Specifically, the commission could, as it did below, invoke its authority under R. C. 4909.15(D)(2)(b) to "fix and determine the just and reasonable rate * * * to be * * * charged, * * * and order such just and reasonable rate * * * to be substituted for the existing one."

This joining of statutory authority to support the com-

---

[2]Appellant attempts to distinguish *Ohio Bell Telephone Co.*, *supra*, on the basis that, in that cause, the commission was confronted with new rates not previously fixed. We feel this is a distinction without a difference. It should not matter whether the commission previously approved of rates, if they now are unjust or unreasonable. Additionally, the plain wording of R. C. 4905.26 does not support the limitation appellant attaches to it. The statute requires the commission to fix a time for hearing whenever it has reasonable grounds to believe that *any* rate is unjust or unreasonable, not merely when it is confronted with a new rate not previously passed upon.

mission's investigation of existing rates and subsequent substitution of new rates was approved of by the United States Supreme Court in *Public Utilities Comm. of Ohio v. United Fuel Gas Co.* (1943), 317 U. S. 456, 464. There, the court was concerned with an attempt by the commission to fix rates retroactively. To support its holding that the commission's authority was prospective only, the court combined G. C. 614-21 and 614-23 (predecessors of R. C. 4905.26 and 4909.15, respectively).[3] We concur in this combined reading of R. C. 4905.26 and 4909.15(D), as being appropriate in situations such as the instant cause, and as effectuating the public interest.

## II.

Ohio Utilities contends further that Section 4 of Am. Sub. S. B. No. 94 prohibits appellee from applying the original cost provisions of Ohio's new rate law to the investigation of appellant's existing rates. Section 4 provides, in relevant part:

" * * * this act does not apply to an application for an increase in any rate filed under section 4909.18, * * * of the Revised Code prior to January 1, 1976, and all proceedings and orders in connection therewith shall be governed by the law in effect at the time of the filing of the application."

Appellant's previously existing rates were established under the former rate law, subsequent to appellant's application for a rate increase filed under R. C. 4909.18. The

---

[3]The judicially combined provisions read as follows: " 'Upon complaint in writing, against any public utility, by any person, firm or corporation, or upon the initiative or complaint of the commission that any rate . . . is in any respect unjust, unreasonable, unjustly discriminatory, or unjustly preferential or in violation of law, . . . the commission shall notify the public utility' and hold a hearing. If, after such hearing, the Commission finds that the rate or charge is unjust, unreasonable, or otherwise unlawful, it must 'fix and determine the just and reasonable rate, fare, charge, toll, rental or service *to be thereafter* rendered, charged, demanded, exacted or collected for the performance or rendition of the service, and order the same substituted therefore.' " (Emphasis *sic*) (*Public Utilities Comm. of Ohio, supra,* at page 464.)

former law determined rate base on the basis of reproduction cost new less depreciation. The instant investigation, begun on September 7, 1977, determined appellant's rate base on the basis of the original cost method prescribed by the new rate law. Since the effect of this proceeding was to reduce the rates established under the old law, Ohio Utilities views this R. C. 4905.26 investigation as a continuation of the prior proceeding, so that the application of original cost is prohibited by Section 4.

Contrary to appellant's contention, the instant proceeding was not a rehearing or continuation of appellant's prior application for a rate increase. It was, rather, a separate investigation of the reasonableness of Ohio Utilities' rates, begun *after* the new rate law became effective. Appellant's line of reasoning would insulate all rates set under prior law from review by the commission, no matter how unjust or unreasonable they may have become. We cannot believe that the General Assembly intended such a result when it enacted Section 4.

In so stating, we do not mean to imply that appellee is free to require all utilities to defend their rate schedules in an R. C. 4905.26 investigation and hearing, simply because their rates were fixed under the old law. R. C. 4905.26 requires that "reasonable grounds for complaint" be stated before the commission can conduct a hearing and order a utility to produce information. This prerequisite should apply whether the commission begins such a proceeding on its own initiative, or on the complaint of another party. Here the investigation was based upon what appellee's staff described as "the apparently unique circumstance of the Ohio Utilities Co., *e. g.*, a high original cost to reproduction cost factor and substantial amounts of contributed property." We agree with appellee that this unique status of Ohio Utilities provided "reasonable grounds" for the commission to proceed to hearing.

### III.

Appellant's third major challenge to the proceedings below focuses on appellee's exclusion of contributed property or "contributions in aid of construction" from the

rate base. Specifically, the commission excluded the amount contained in Account No. 271 (Contributions in Aid of Construction), $4,391,120 of which consisted of cash and property supplied by the Davis-owned development companies. Appellee justified these exclusions as being required by R. C. 4909.05(I) and (J).[4]

Appellant contends that by excluding such contributions from the rate base, after they had been included under the former law, R. C. 4909.05 effectively confiscates such property in violation of the Due Process Clause of the Fourteenth Amendment. This assertion is without merit. In 1942, the United States Supreme Court declared that, "[t]he Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas." *Federal Power Comm.* v. *Natural Gas Pipeline Co.* (1942), 315 U. S. 575, 586. In a concurring opinion, Justice Black went on to state, at page 603, that, "rate-making is one species of price-fixing. Price-fixing, like other forms of social legislation, may well diminish the value of the property which is regulated. But that is no obstacle to its validity." Thus, appellant's analogy to eminent domain principles is completely misplaced.

The exclusion from rate base of contributions in aid of utility construction is so uniformly accepted in other jurisdictions as "probably not to require detailed citation."[5] Two interrelated reasons support such an exclusion. Jus-

---

[4]R. C. 4909.05 provides, in pertinent part:

"The public utilities commission shall prescribe the form and details of the valuation report of the property of each public utility * * *. Such report shall contain the following facts in detail:

"* * *

"(I) Any sums of money or property that the company may have received as total or partial defrayal of the cost of its property;

"(J) The valuation of the property of the company shall be the sum of the amounts contained in the report pursuant to divisions (C), (D), (E), (F), and (G) of this section, less the sum of the amounts contained in the report pursuant to divisions (H) and (I) of this section."

[5]1 Priest, Principles of Public Utility Regulation, 177.

tice Brandeis enunciated the first reason in his dissent from the opinion in *Missouri, ex rel. S. W. Bell Tel. Co.,* v. *Public Service Comm.* (1923), 262 U. S. 276, 290, as follows: "The thing devoted by the *investor* to the public use is * * * capital embarked in the enterprise. Upon the capital so invested the Federal Constitution guarantees to the utility the opportunity to earn a fair return." (Emphasis added.) It is thus the investment of the shareholder which comprises the rate base, not contributions of others. This is especially true in "original cost" jurisdictions, since a contribution would normally have a zero original cost.

The corollary to this first rationale for excluding customer contributions is contained in *Cincinnati v. Pub. Util. Comm.* (1954), 161 Ohio St. 395. There, in discussing customer contributions in the form of deposits and advances on installation charges, at page 405, we stated: " 'Where the rate payers provide such funds, it is not proper that the stockholders should be allowed a return on them by including them in the rate base.' " (Quoting from *Chicopee Mfg. Co. v. Pub. Serv. Co.* [N. H. 1953], 93 A. 2d 820, 826.) Such contributions are not devoted to public use by the utility's investors, but by the customers for their own, not the investors', benefit.

Ohio Utilities argues that since these funds were received from the development companies which had the same ownership as did the utility, the property should be considered investment by shareholders. This argument, however, negates the basic distinction between corporate and shareholder identity.

The language of R. C. 4909.05 (I) is not limited to direct customer contributions, and most other courts have upheld exclusions of similar development company contributions For instance, when confronted with the same contention in *Hagerstown v. Public Service Comm.* (1958), 217 Md. 101, 108, 141 A. 2d 699, the court there found "no difference, * * * whether these payments were made in the first instance by the developers or by the purchasers of lots." Though there was no direct evidence to show that

the funds originally came from customers, the court took judicial notice that "any such costs originally paid by the developers [to secure water service from the utility] were passed on to the purchasers in the form of increased prices for lots." Similarly, in *Princess Anne Utilities Corp.* v. *Commonwealth* (1971), 211 Va. 620, 624, 179 S. E. 2d 714, the court discussed the "common practice in real estate development to finance construction of sewerage facilities by the contribution method employed in this case, with the cost of such construction reflected in the prices paid by the purchasers of homes in the finished development." Finally, in *Florida Cities Water Co.* v. *Board of Cty. Com'rs* (Fla. App. 1976), 334 So. 2d 622, 625, a Florida appeals court found that, "since the developer and the utility had a common ownership and the utilty serviced the lots being developed by the developer, a reasonable inference may be drawn that the source of these monies came from the sale of the lots." The same inference arises in the instant cause, and it is supported by the method by which the funds were accounted for and by testimony that the market price of the improved lots did reflect the value of water and sewer services. Thus, appellee correctly excluded the amounts contained in Account No. 271 from the rate base.

## IV.

Ohio Utilities argues next that it was denied due process of law by the commission's alleged waiver of its Rule 4901-1-18, Ohio Adm. Code, which, in a case such as the one herein, requires the issuance of an attorney examiner's report before the commission proceeds to opinion and order. Here, appellee dispensed with this report because of its desire to conduct this investigation in an expeditious fashion. Since this matter was initiated pursuant to R. C. 4905.26 and heard before attorney examiners, it seems that an attorney examiner's report was required,[a] and it was thus error for appellee to waive it. However, Ohio Utilities

---

[a] Effective November 26, 1978, Rule 4901-1-18(A), Ohio Adm. Code, was amended to provide that this requirement may be dispensed with by order of the commission or by express waiver by the parties.

has not shown that it was prejudiced by this error. It is well-settled that "[t]his court will not reverse an order of the commission as unreasonable or unlawful because of an error of the commission, if such error did not prejudice the party seeking such reversal." *Cincinnati* v. *Pub. Util. Comm.* (1949), 151 Ohio St. 353, paragraph six of the syllabus. In its application for rehearing, appellant raised numerous allegations of error, thus giving the commission ample opportunity to remedy any irregularities in its May 18, 1978, opinion and order. It is difficult for this court to imagine what additional objections appellant may have wished to level against the contents of an examiner's report.

## V.

The contention that the commission violated appellant's due process rights by use of an historical test period and date certain, rather than the test period recommended by R. C. 4909.15 (C) is refuted by our opinion in *Franklin Co. Welfare Rights Org.* v. *Pub. Util. Comm.* (1978), 55 Ohio St. 2d 1, wherein, at page 6, we enunciated the basic reason for the use of test year results: " * * * The test year operations of a utility are utilized to determine whether that utility should be authorized to earn additional operating income from proposed future rates. The test year results must therefore be *reasonably representative* of normal operations." (Emphasis added.) In that case, the new rates became effective seven months after the close of the test period, whereas here the lag was eight months. In neither *Franklin Co. Welfare Rights Org.*, nor in the instant cause, did the utility show that the actual results of the historical test period are less representative than the partially projected data of the test period recommended by R. C. 4909.15(C).

The remainder of appellant's propositions of law relate to matters which are within the discretion of the commission. Specifically, appellant questions the commission's selection of the proper rate base and depreciation accrual rates; the allocation of federal income tax expense

to appellant on the basis of an average rate taken from the consolidated tax return of appellant's parent company; the extent to which the commission included rate case expenses in appellant's operating expenses; and the reasonableness of the rate of return selected by the commission. As we have stated on several occasions, "[a] commission finding will not be disturbed unless manifestly against the weight of the evidence and so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty." *Akron* v. *Pub. Util. Comm.* (1978), 55 Ohio St. 2d 155, 156. See, also, *Cincinnati* v. *Pub. Util. Comm.* (1978), 55 Ohio St. 2d 168, and *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403. We find that in none of these instances did appellee abuse its discretion.

The commission's order, being neither unreasonable nor unlawful, is hereby affirmed.

*Order affirmed.*

CELEBREZZE, C. J., HERBERT, W. BROWN and LOCHER, JJ., concur.

P. BROWN, J., concurs in paragraphs one and three of the syllabus and in the judgment.

HOLMES, J., dissenting. I must dissent in that I believe that the Public Utilities Commission erred in excluding certain paid-in capital which should have been treated as investments by the original owners of Ohio Utilities Company, as well as an investment by the purchasing corporation.

Even though carried in an incorrect account, No. 271, labeled "Contributions in Aid of Construction," the original input of monies from the wholly owned development companies was to fund the costs of the utility company's asset development. Even recognizing the separation of the corporate entities from the original owners, the Davis family, all the capital stock in the utility company and the

land development companies was totally owned by the Davis family.

There was no showing here that the amount of capital input by the Davis family was recouped by the land development companies through the increased cost of the lots. It would appear from the testimony here that it was the investors, and not the people who purchased the lots and thereby became the customers of the utility, who were the source in fact of the $4,391,000 excluded from the rate base.

Despite the fact that the Public Utilities Commission may have found some basis for the exclusion of the sums as previously paid in by the land development companies owned by the Davis family in that such sums had been carried in Account No. 271 and entitled "Contributions in Aid of Construction," allowance should have been made for the $600,000 in capital contributions made by the Davis family during the period of the negotiation of the sale of the utility company to Citizens Utilities Water Company of Arizona.

The facts show that during the negotiations mandatory construction requirements amounting to $600,000 had to be accomplished prior to completion of the sale. This construction was financed by the Davis family on the condition that this amount would be reimbursed by the purchasers, Citizens Utilities Water Company.

Although Citizens Utilities Water Company did in fact repay the $600,000 as part of the consideration for the buyout of the total assets of the Davis family, and subsequently carried this $600,000 investment in an appropriate account along with the other assets as purchased, the commission disallowed this sum because the Davis family had entered such amount in Account No. 271 as a contribution in aid of construction. It is my belief that such an amount most certainly should not have been excluded from the rate base of the property of this appellant which was used and useful in the furnishing of its utility services.