OHIO CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Ohio Consumers' Counsel v. Pub. Util. Comm.*,
110 Ohio St.3d 394, 2006-Ohio-4706.]

(No. 2005–0945—Submitted May 9, 2006—Decided September 27, 2006.)

O'DONNELL, J.

{¶ 1} In this appeal, the Ohio Consumers' Counsel challenges an order issued by the Public Utilities Commission of Ohio ("PUCO") that approved a 2004 agreement between the Dayton Power & Light Company ("DP&L") and several other entities, Dominion Retail, Inc., Green Mountain Energy Company, Miami Valley Communications Council, and Industrial Energy Users–Ohio, each of which had questioned DP & L's efforts to recoup the cost of changing its billing practices after the General Assembly deregulated the retail electricity market in 1999.

{¶ 2} The PUCO order at issue changed the way in which DP & L could recover its billing-system costs. For the reasons that follow, we affirm the PUCO's order.

## Facts

{¶ 3} DP & L incurred the $18.8 million in billing-system costs at issue in this case because the statutes that deregulated electricity in Ohio required electric utilities to "unbundle" or separate the costs of electricity generation from the costs of electricity distribution. See R.C. 4928.10(C)(2) and 4928.35. As a result, DP & L developed new computer programs enabling the company to produce the type of customer bills that the statutes and PUCO regulations required in a deregulated electricity market.

{¶ 4} In 2000, the PUCO approved DP & L's initial plan to charge "CRES providers" for the costs associated with the billing-system changes. A CRES provider is a provider of competitive retail electric service. See Ohio Adm.Code 4901:1–10–01(F) and 4901:1–21–01(A)(10). Both Dominion Retail, Inc. and Green

Mountain Energy Company—which joined the 2004 agreement at issue—are CRES providers.

{¶ 5} In the competitive retail market for electricity established by the General Assembly in 1999, customers have the option to choose to continue paying their original electricity provider for generation service or to select a CRES provider for that service. R.C. 4928.14. Regardless of which provider the customer selects, the electricity generated by the provider is delivered over wires owned and maintained by the electric utility, and that company can continue to charge for the delivery service.

{¶ 6} The PUCO requires electric utilities such as DP & L that distribute electricity to offer "consolidated billing" to the CRES providers that want to offer competing electricity generation service to retail customers in the utility company's territory. Ohio Adm.Code 4901:1–10–29(G). See, also, Ohio Adm.Code 4901:1–10–01(D) (" 'Consolidated billing' means that a customer receives a single bill for electric services provided during a billing period" for both distribution services and generation services). Evidence in the record before us indicates that DP & L had to do substantial reprogramming of its computers to accommodate the new requirement that it offer a consolidated bill showing the unbundled charges incurred by any customer in its territory who chose to buy electricity generation service from a CRES provider while DP & L continued to provide electricity-distribution service to the customer.

{¶ 7} In making its initial 2000 plan to charge CRES providers for the billing-system changes, DP & L calculated that it would have to charge $4.76 for each consolidated bill it generated for a CRES provider to fully recover the costs of the billing changes. DP & L concluded that potential CRES providers in its territory would not be willing to pay such a high price for the production of each customer bill, so DP & L chose to charge CRES providers $1.90 per bill under a one-year contract or $1.56 per bill under a two-year contract.

{¶ 8} The lesser amount did not satisfy CRES providers such as Dominion Retail and Green Mountain Energy Company, and as a result, Dominion filed a complaint with the PUCO in 2003, and Green Mountain then intervened to challenge the amount DP & L charged CRES providers for each consolidated customer bill DP & L generated for them. The Miami Valley Communications Council—a regional council of governments interested in promoting competition in the retail electricity market—likewise filed a complaint against DP & L with the PUCO in 2003 alleging that DP & L charged CRES providers excessive amounts for billing services.

{¶ 9} The PUCO consolidated the cases and granted motions to intervene filed by the Consumers' Counsel and Industrial Energy Users–Ohio. At a hearing before the PUCO on these complaints, Dominion Retail and Miami Valley offered

evidence that the DP & L charges were "excessive and unreasonable," "discourage[d] shopping," and constituted a "barrier to competition." Expert testimony presented by the Consumers' Counsel echoed those views, describing the charges to CRES providers as "a significant impediment to competition" that would "significantly decrease the savings a residential customer would expect to realize" from switching to a new provider of retail electric-generation service.

{¶ 10} After several days of hearings before the PUCO in 2004, all parties except the Consumers' Counsel reached an agreement to change the way in which DP & L could recover the $18.8 million in billing-related costs it had incurred from 1999 to 2001. The stipulation called for DP & L to charge CRES providers only $.20 per customer bill (to cover the cost of transmitting customer data electronically between DP & L and the CRES provider) and then—beginning January 1, 2006—allowed DP & L to recover from all of its customers those costs of the billing-system changes that had been approved in an audit.

{¶ 11} The stipulation also provided for DP & L to recover from a CRES provider's customers any of DP & L's out-of-pocket costs resulting from the default of that CRES provider after reasonable efforts to recover from the CRES provider.

{¶ 12} The Consumers' Counsel refused to join the stipulation. The PUCO considered the objections raised by the Consumers' Counsel but nonetheless approved the agreement in February 2005, concluding that a reasonable arrangement would benefit ratepayers and the public. The Consumers' Counsel filed an application for rehearing, but the PUCO denied that application. This appeal followed.

## Standard of Review

{¶ 13} "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.,* 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. The court will not reverse or modify a PUCO decision as to questions of fact if the decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.,* 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The appellant bears the burden of demonstrating that the PUCO's decision is against the manifest weight of the evidence or is clearly unsupported by the record. Id.

{¶ 14} Although the court has "complete and independent power of review as to all questions of law" in appeals from the PUCO, *Ohio Edison Co. v. Pub. Util. Comm.* (1997), 78 Ohio St.3d 466, 469, 678 N.E.2d 922, the court has explained

that it may rely on the expertise of a state agency like the PUCO in interpreting a law where "highly specialized issues" are involved "and where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 108, 110, 12 O.O.3d 115, 388 N.E.2d 1370.

## Analysis

### *The Order Allowing DP & L to Charge Customers for the Billing– Related Changes Made by DP & L Is Reasonable*

{¶ 15} The Consumers' Counsel contends first that the multiparty agreement approved by the PUCO is not beneficial to ratepayers and that it improperly deviates from DP & L's initial intention to recover from CRES providers rather than from consumers the $18.8 million cost of reprogramming DP & L's computers to accommodate new billing practices mandated by the General Assembly when the competitive retail market for electricity was established in Ohio. The PUCO, DP & L, and Dominion Retail each counter those arguments, claiming that the PUCO's approval of the agreement was entirely reasonable.

{¶ 16} This court applies a three-part test when evaluating the reasonableness of settlements approved by the PUCO: whether the settlement is a product of serious bargaining among capable, knowledgeable parties; whether the settlement, as a package, benefits ratepayers and the public interest; and whether the settlement package violates any important regulatory principles or practices. *Consumers' Counsel v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 123, 126, 592 N.E.2d 1370. See, also, *AK Steel Corp. v. Pub. Util. Comm.* (2002), 95 Ohio St.3d 81, 82–83, 765 N.E.2d 862.

{¶ 17} The Consumers' Counsel urges that the agreement in this case fails the second and third prongs of the test, alleging that consumers will pay costs under the agreement that DP & L initially planned to recover solely from CRES providers. To support its argument, the Consumers' Counsel points to a separate one-page sidebar agreement between DP & L and the Consumers' Counsel. In that sidebar agreement from June 2000, DP & L had agreed that it would "not seek recovery from residential customers" for costs associated with "billing system modifications" made by DP & L. The PUCO's failure to enforce that earlier agreement when DP & L and other parties presented their new agreement in October 2004 represented a "willful disregard of duty," according to the Consumers' Counsel.

{¶ 18} However, the June 2000 sidebar agreement was never filed with or approved by the PUCO, and for that reason, the PUCO refused to consider it when weighing the reasonableness of the 2004 agreement, explaining that "[u]nderstandings among parties that are important enough that the parties wish to

have a means to bring them to the Commission's attention at a later time" should be brought "to the Commission for approval" when those understandings are reached. The PUCO has taken a similar approach in past cases, and we have approved that practice. See, e.g., *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 14–15 (approving the PUCO's refusal to consider side agreements that had not been incorporated into the agreement at issue); *Cookson Pottery v. Pub. Util. Comm.* (1954), 161 Ohio St. 498, 505, 53 O.O. 374, 120 N.E.2d 98, citing G.C. 614–17, the predecessor of R.C. 4905.31 (contracts between a public utility and its customers that are not filed with the PUCO "shall not be lawful"). R.C. 4905.31(E) provides that no financial arrangement between a public utility and consumers "is lawful unless it is filed with and approved by" the PUCO.

{¶ 19} The PUCO's refusal, then, to consider the unapproved June 2000 sidebar agreement between the Consumers' Counsel and DP & L appears consistent with past practice and with the relevant statutory provision.

{¶ 20} The PUCO also properly applied our three-part test for weighing the reasonableness of the October 2004 agreement at issue in this case. Ample evidence in the record supports the PUCO's conclusion that the agreement would be a "benefit to ratepayers and the public interest" and would "limit[ ] any negative impact on competition in DP & L's territory" by doing away with DP & L's initial plan to charge CRES providers up to $1.90 for each consolidated electric bill prepared by the utility company.

{¶ 21} As the PUCO noted in its order, "it is a benefit to the ratepayers and the public interest for the parties to these cases to agree to a per-bill fee that is substantially lower than DP & L currently charges." The PUCO also explained that the 2004 agreement is consistent with standard regulatory practices because other electric and gas utility companies have been allowed to recover from their customers the same kind of billing-related charges that the agreement calls for DP & L to recover from its customers.

{¶ 22} The agreement also brings other benefits to the consumer. The reduced charges to CRES providers for each customer bill will lower any barrier that may have kept Dominion Retail and other competitors of DP & L from winning customers for retail electricity generation service in DP & L's territory. And because all customers benefit from having greater choices in a competitive retail electricity market, the stipulation's removal of a significant barrier to the entry of new competitors in DP & L's territory benefits all customers in that area. As a result, as one witness testified, it is reasonable to ask all customers to pay for that benefit.

{¶ 23} Upon review, we have concluded that the record supports the reasonableness of the PUCO's order approving the 2004 agreement and contains

sufficient probative evidence to justify the PUCO's factual findings that the agreement would benefit ratepayers and the public interest and would not violate any important regulatory principles or practices. The PUCO's decision finding the agreement reasonable is therefore not "manifestly against the weight of the evidence" and is not "so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty." *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.* (2000), 88 Ohio St.3d 549, 555, 728 N.E.2d 371.

### The Order Allowing DP & L to Charge Customers for the Billing–Related Changes Made by DP & L Is Lawful

{¶ 24} The Consumers' Counsel further challenges the lawfulness of the PUCO's order, arguing that the PUCO should not have deviated from one of its own earlier orders and should have enforced various statutory requirements that apply to utility rate increases. We conclude that the PUCO properly rejected both arguments.

{¶ 25} First, the Consumers' Counsel contends that in accordance with the PUCO's 2000 order, DP & L could not recover its billing-related costs from CRES providers before 2007. However, in *Consumers' Counsel v. Pub. Util. Comm.* (1984), 10 Ohio St.3d 49, 50–51, 10 OBR 312, 461 N.E.2d 303, we explained that the PUCO may change or modify earlier orders as long as it justifies any changes. The agreement reached by DP & L and the other parties in 2004, and approved by the PUCO in the proceedings below in 2005, created a new and entirely reasonable way for DP & L to recover the billing-related costs it had incurred between 1999 and 2001. As explained above, the record supported the change, and the PUCO fully explained its reasons for approving the agreement. The PUCO was not bound to adhere to an earlier arrangement that had created anticompetitive barriers to the entry of new CRES providers in DP & L's territory, and the PUCO's decision to remove those barriers by modifying an earlier PUCO order was not unlawful.

{¶ 26} The Consumers' Counsel next contends that the statutory requirements for utility rate increases should have been followed in the proceedings below. Under the statute cited by the Consumers' Counsel, a public utility seeking to change its existing rates for customers must "file a written application" with the PUCO and must prove at any hearing held on the request that it is "just and reasonable." R.C. 4909.18. The application for a rate increase must also be published by the PUCO in a newspaper in the utility company's territory, R.C. 4909.19, and public hearings must be held in large municipalities in the affected service area, R.C. 4903.083.

{¶ 27} Those specific statutory provisions were not followed in this case, as the proposal that DP & L's customers pay for the expenses it incurred to reprogram

its computers between 1999 and 2001 to accommodate consolidated billing had emerged not from a formal rate-increase application but from the agreement between DP & L and the other parties in October 2004. Nonetheless, the agreement is valid, and the PUCO lawfully approved it in February 2005.

{¶ 28} The agreement in this case was reached in an R.C. 4905.26 complaint proceeding, not an R.C. 4909.18 rate-increase proceeding (with all of the attendant procedural requirements cited by the Consumers' Counsel). That former statutory provision was cited by CRES provider Dominion Retail and by the Miami Valley Communications Council when they filed their separate complaints against DP & L to initiate the proceedings that led to the agreement at issue several months later. In its February 2005 order approving the parties' settlement agreement, the PUCO acknowledged that the agreement "arose in the context of a complaint case" rather than in a rate-increase proceeding.

{¶ 29} We have repeatedly held that utility rates may be changed by the PUCO in an R.C. 4905.26 complaint proceeding such as this, without compelling the affected utility to apply for a rate increase under R.C. 4909.18. See, e.g., *Lucas Cty. Commrs. v. Pub. Util. Comm.* (1997), 80 Ohio St.3d 344, 347, 686 N.E.2d 501 ("Pursuant to R.C. 4905.26 * * *, the commission may conduct an investigation and hearing, and fix new rates to be substituted for existing rates, if it determines that the rates charged by the utility are unjust and unreasonable"); *Allnet Communications Servs., Inc. v. Pub. Util. Comm.* (1987), 32 Ohio St.3d 115, 117, 512 N.E.2d 350 ("R.C. 4905.26 is broad in scope as to what kinds of matters may be raised by complaint before the PUCO. In fact, this court has held that reasonable grounds may exist to raise issues which might strictly be viewed as 'collateral attacks' on previous orders"); *Ohio Util. Co. v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 153, 157, 12 O.O.3d 167, 389 N.E.2d 483 (in an R.C. 4905.26 proceeding, the PUCO can "order[ ] that new rates be put in effect").

{¶ 30} As R.C. 4905.26 itself provides, "any person, firm, or corporation," as well as the PUCO itself, may file a complaint alleging that an existing or proposed utility rate or charge is unjust or unreasonable. That kind of allegation was raised by both Dominion Retail and the Miami Valley Communications Council in the proceedings below, each of which questioned the charges that DP & L imposed on CRES providers for consolidated-billing services. R.C. 4905.26 indicates that the parties to a complaint proceeding "shall be entitled to be heard, represented by counsel, and to have process to enforce the attendance of witnesses." No allegation exists that those requirements were not met in the proceedings below, and in fact the PUCO held several days of hearings on the complaints and heard from multiple witnesses, including a witness who testified on behalf of the Consumers' Counsel.

{¶ 31} Some of the testimony in the R.C. 4905.26 complaint proceeding before the PUCO in 2004 indicated that the PUCO's 2000 order—which allowed DP & L to charge CRES providers for the computer-related consolidated-billing costs that it incurred between 1999 and 2001—was unreasonable and posed a barrier to the entry of new CRES providers in DP & L's service area. Testimony presented after most of the parties in the complaint proceeding reached their October 2004 agreement indicated that shifting the computer-related costs from CRES providers to DP & L's customers would foster competition in DP & L's service area by "mak[ing] it easier for CRES providers to offer savings to customers." Multiple witnesses also testified that the agreed resolution of the complaint proceeding was reasonable and appropriate. Relying on that evidence in the record, the PUCO approved the agreement in February 2005.

{¶ 32} The PUCO acted lawfully. As noted above, this court has allowed the PUCO to impose new utility rates or to change existing rates in other R.C. 4905.26 complaint proceedings, and there is no dispute that the PUCO complied with all of the procedural requirements in the statute by holding a hearing and by allowing the parties to be represented by counsel and to compel the attendance of witnesses.

*The Portion of the PUCO's Order Giving DP & L Additional*
*Protections in the Event of a CRES Provider's Default*
*Is Also Reasonable and Lawful*

{¶ 33} Although the Consumers' Counsel primarily focuses on the reasonableness and lawfulness of the PUCO decision permitting DP & L to charge its customers for the costs that DP & L incurred when it made software changes in order to produce unbundled consolidated customer bills, the Consumers' Counsel also challenges a provision of the PUCO order allowing DP & L to recover from a CRES provider's customers any of DP & L's out-of-pocket costs resulting from the default of that CRES provider.

{¶ 34} The PUCO and DP & L argue that the Consumers' Counsel should not be permitted to raise this issue because she did not first raise it in the application for rehearing before the PUCO. Those parties are correct in that R.C. 4903.10 states, "No party shall in any court urge or rely on any ground for reversal, vacation, or modification not so set forth in the application." Yet the Consumers' Counsel *did* challenge the default recovery mechanism in the application for rehearing, and the PUCO addressed the issue in its order denying rehearing. The Consumers' Counsel has therefore properly raised the issue.

{¶ 35} The default-recovery mechanism approved by the PUCO is unlawful according to the Consumers' Counsel because no statutory or regulatory provisions in Ohio expressly permit that kind of financial protection to be given to an

electricity distributor like DP & L. Notably, though, the Consumers' Counsel cites no statutory provisions that *disallow* the practice either.

{¶ 36} R.C. 4928.08(B) requires CRES providers to "provid[e] a financial guarantee sufficient to protect customers and electric distribution utilities from default," and Ohio Adm.Code 4901:1–24–08(C) allows an electricity distributor (like DP & L) to "apply for relief" at the PUCO if a CRES provider fails to maintain such a guarantee. Those provisions—the only ones cited by the Consumers' Counsel—do not prevent the PUCO from approving the kind of additional financial protections given to DP & L to ensure that it will not incur losses when a CRES provider in its territory defaults.

{¶ 37} As one witness testified before the PUCO about this so-called default recovery rider, it "establishes a reasonable and appropriate process for the recovery by DP & L of prudently incurred costs of a CRES provider default * * * [and] will protect DP & L from costs that DP & L may incur to procure replacement power to serve customers who had been served by a defaulting CRES provider." Another witness testified that because DP & L does not select CRES providers (customers do), and because DP & L does not benefit from CRES providers' services (customers do), it is reasonable for the customers of a CRES provider to reimburse an electricity distributor such as DP & L for the out-of-pocket costs DP & L incurs when the CRES provider defaults. Testimony before the PUCO also indicated that similar default recovery mechanisms currently protect natural gas distributors.

{¶ 38} The PUCO cited and agreed with all of that testimony, stating in its February 2005 order that the default recovery mechanism "is not prohibited by any current statute or rule" and is in fact "permissible under the current statutory system." The likelihood that DP & L will ever invoke the default recovery mechanism is small, the PUCO noted, but it is "a reasonable method to spread the risk of the competitive market."

{¶ 39} The PUCO's findings as to the reasonableness of this particular provision of the 2004 agreement are supported by the record, and its legal conclusion that the provision is not unlawful is correct. The order, therefore, allowing DP & L to recover from a CRES provider's customers any of DP & L's out-of-pocket costs resulting from the default of the CRES provider was both reasonable and lawful.

## Conclusion

{¶ 40} For the reasons explained above, the order of the PUCO that allowed DP & L (1) to shift from CRES providers to DP & L's customers the costs that DP & L incurred to update its computer software in order to provide consolidated customer bills for CRES providers in its territory and (2) to recover from a

CRES provider's customers any of DP & L's out-of-pocket costs resulting from the default of the CRES provider was both reasonable and lawful. The PUCO fully explained the rationale for its order, evidence in the record supports the PUCO's decision, and the order is not inconsistent with any statutory or regulatory requirements. Therefore, the order of the PUCO is affirmed.[1]

Order affirmed.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR and LANZINGER, JJ., concur.

---

Janine L. Migden–Ostrander, Ohio Consumers' Counsel, Jeffrey L. Small, and Larry S. Sauer, for appellant.

Jim Petro, Attorney General, Duane Luckey, Senior Deputy Attorney General, and Steven T. Nourse and William L. Wright, Assistant Attorneys General, for appellee, Public Utilities Commission of Ohio.

Faruki, Ireland & Cox, P.L.L., Charles J. Faruki, and Jeffrey S. Sharkey, for intervening appellee, the Dayton Power & Light Company.

Bell, Royer & Sanders Co., L.P.A., Barth E. Royer, and Judith B. Sanders, urging affirmance for amicus curiae, Dominion Retail, Inc.

---

1. In accordance with S.Ct.Prac.R. IX(8), the Consumers' Counsel filed a list of additional authorities before the oral argument in this case. That list of citations was timely filed, and we therefore deny the PUCO's and DP & L's motions to strike the list.