French, J., concurring in part and dissenting in part.
{¶ 72} I agree with the conclusion of a majority of this court that the Public Utilities Commission's trade-secret determination regarding the information discussed in the lead opinion lacks record support. I disagree, however, with the determination reached in both the lead and concurring opinions that the commission engaged in unlawful retroactive ratemaking when it disallowed more than $43 million in renewable-energy-credit ("REC") costs that appellants and cross-appellees, the FirstEnergy companies (Ohio Edison Company, Cleveland Electric Illuminating Company, and Toledo Edison Company [ (collectively, "FirstEnergy") ] ), had collected from customers. Therefore, I concur in part and dissent in part.
ANALYSIS
{¶ 73} A majority of the court holds that FirstEnergy as a matter of law is not required to return to ratepayers over $43 million in REC costs, even though FirstEnergy was authorized to recover only prudently incurred REC costs and the commission determined that those costs were imprudently incurred. According to both the lead opinion and the concurring opinion, FirstEnergy may keep these incurred costs because ordering FirstEnergy to return this money to customers is unlawful retroactive ratemaking. The lead opinion offers two grounds for this conclusion: (1) the commission's lack of objection to the rates charged under an "Alternative Energy Resource Rider" ("Rider AER") barred a refund in this case and (2) R.C. 4905.32 bars any refund in this case because the commission-approved tariff for Rider AER did not specify a refund. Because neither ground justifies the result reached by a majority of this court, I dissent.
The commission's quarterly review and approval of Rider AER did not result in a fixed rate
{¶ 74} FirstEnergy argues that the REC costs were charged and collected *17 through Rider AER under a commission-approved tariff and that therefore, the rule against retroactive ratemaking bars any refund or disallowance of money already collected by its companies. *307 {¶ 75} FirstEnergy is referring to the tariff language of Rider AER, which required the FirstEnergy companies to request approval of the rider charges from the commission each quarter and provided that the requested rates would go into effect one month later "unless otherwise ordered by" the commission. According to FirstEnergy, this process gave the commission "numerous opportunities to review and object to the rates in Rider AER or to the process by which the Companies incurred costs recovered under that Rider." And because the commission took no action to delay or disapprove of the charges proposed in the quarterly filings before they became effective, FirstEnergy asserts that the Rider AER rates became fixed and, consequently, were not subject to refund.
{¶ 76} The lead opinion agrees, finding that the commission's failure to object to the rates proposed in the quarterly filings somehow turned those proposed rates into fixed ones. According to the lead opinion, "[b]ecause FirstEnergy recovered REC costs under a 'filed' rate schedule, the commission was prohibited from later ordering a disallowance or refund of those costs." Id. at ¶ 18. The lead opinion is wrong to rely on this quarterly review process to reverse the commission's disallowance of REC costs.
{¶ 77} First, the lead opinion acknowledges in its statement of facts that FirstEnergy was allowed to recover only its "prudently incurred costs" of purchasing RECs, id. at ¶ 8, but it then ignores that fact in resolving this issue. In FirstEnergy's first electric-security-plan ("ESP") case, FirstEnergy entered into a stipulation with the other parties that resolved all issues in the ESP case. See In re Application of Ohio Edison Co. , Pub. Util. Comm. Nos. 08-935-EL-SSO, 09-21-EL-ATA, 09-22-EL-AEM, and 09-23-EL-AAM, Stipulation and Recommendation (Feb. 19, 2009). Under the stipulation, the parties proposed Rider AER as the mechanism to recover the costs that FirstEnergy planned to incur in meeting its alternative-energy-resource requirements under R.C. 4928.64. Id. at 10-11, stipulation No. 9. In March 2009, the commission issued an order adopting the stipulation, thereby approving FirstEnergy's ESP, including Rider AER. In re Application of Ohio Edison Co. , Pub. Util. Comm. Nos. 08-935-EL-SSO, 09-21-EL-ATA, 09-22-EL-AEM, and 09-23-EL-AAM, 2009 WL 874475, 2009 Ohio PUC LEXIS 279, *17 (Mar. 25, 2009).
{¶ 78} Under the ESP order, FirstEnergy was allowed to implement Rider AER to "recover, on a quarterly basis, the prudently incurred costs of" obtaining RECs. (Emphasis added.) Id. That is, the commission allowed FirstEnergy to automatically recover its REC costs, on the condition that a later review would be conducted to determine whether those costs were prudently incurred.
{¶ 79} So while it is true that we have prohibited refunds of money collected under final commission-approved rates, it is not true that the rates charged under Rider AER were final, approved rates. To conclude that they were, we must *308 disregard the clear terms of the ESP order, which expressly limited FirstEnergy's recovery to only those REC costs that were prudently incurred. Nothing before us supports the lead opinion's finding that the rates charged under Rider AER were fixed and thus not subject to refund. *18 {¶ 80} The commission relied on River Gas Co. v. Pub. Util. Comm. , 69 Ohio St.2d 509, 433 N.E.2d 568 (1982), to support disallowing these particular REC costs. The lead opinion distinguishes River Gas solely on the ground that FirstEnergy had already collected its incurred REC costs under the commission-approved tariff for Rider AER. But because the commission's quarterly approval of the Rider AER tariffs did not result in a fixed rate, the attempt to distinguish River Gas falls short.
{¶ 81} Second, the lead opinion is wrong to accept FirstEnergy's argument, asserted in its brief, that the quarterly review process gave the commission "numerous opportunities to review and object to the rates in Rider AER or to the process by which the Companies incurred costs recovered under that Rider." The lead opinion overlooks the commission's finding that the quarterly review process was never intended to be used to audit FirstEnergy's REC purchases for prudence.
{¶ 82} In fact, it was impossible for these quarterly reports to be used for that purpose. Under the tariff language, FirstEnergy submitted its proposed rates for Rider AER each quarter, and charges went into effect one month later unless the commission ordered otherwise. On rehearing below, the commission expressly found that there had been no meaningful opportunity to review the REC costs for prudence during this one-month period. Pub. Util. Comm. No. 11-5201-EL-RDR at 22 (Dec. 18, 2013).
{¶ 83} The lead opinion cites no evidence that the commission could have determined the prudence of FirstEnergy's REC purchases solely by looking at these quarterly tariff filings. FirstEnergy in its brief claims that it "made 27 timely quarterly * * * filings, each updating the Rider AER rate during 2009, 2010, and 2011." And FirstEnergy later refers us to one of those filings, which had an effective date of July 1, 2011.
{¶ 84} But this proposed tariff sheet contains no information that the commission could have reviewed to determine the prudence of FirstEnergy's REC purchases. This tariff sheet includes only the proposed Rider AER rates to be charged to each customer class for the next quarter. It contains no information related to FirstEnergy's REC purchases, such as the number of renewable-energy suppliers in the market, the number of suppliers who bid during FirstEnergy's REC auctions, the quantity of RECs bid or each supplier's bid prices. Contrary to the lead opinion's view, the commission could not have reviewed FirstEnergy's REC purchases for prudence by looking at these quarterly filings.
*309 {¶ 85} Although we have complete and independent power to review all questions of law in appeals from the commission, Ohio Edison Co. v. Pub. Util. Comm. , 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997), we can, and should, consider the expertise of a state agency in interpreting a law when, as here, "highly specialized issues" are involved and when the commission's expertise would "be of assistance in discerning the presumed intent of our General Assembly," Consumers' Counsel v. Pub. Util. Comm. , 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979). Here, the commission explained on rehearing that the process of quarterly filings employed in this case is a standard mechanism "in prudence review and true-up proceedings" (the process of reconciling the rates recovered as revenue by the utility with the costs incurred by the utility). Pub. Util. Comm. No. 11-5201-EL-RDR at 23 (Dec. 18, 2013). Utilities often benefit from this process, as it allows them to implement new rates without regulatory lag, *19 id. at 23-24, and the commission observed that if the process used in this case is found to be retroactive ratemaking, then that process, which has been used in numerous other situations, will no longer be available, id. at 24. Disregarding the commission's expertise on this issue, a majority of the court renders the prudence-review process in this case-a review that FirstEnergy agreed to undergo in its ESP case-meaningless.
{¶ 86} The commission initiated its audit review of FirstEnergy's REC purchases in September 2011. Numerous parties intervened. The commission appointed an independent consultant, Exeter Associates, Inc., to review FirstEnergy's REC purchases for prudence. Exeter filed its audit report in August 2012. Thereafter, the parties engaged in extensive discovery, and attorney examiners issued several entries on motions for protective orders. The parties filed depositions and direct testimony. The commission held five days of audit hearings in February 2013. The parties then filed two rounds of posthearing briefs. The commission issued its order on August 7, 2013, and its final rehearing entry on December 18, 2013, over two years after the case began.
{¶ 87} By the time the commission issued its final order, FirstEnergy had collected nearly all the incurred REC costs from ratepayers. A majority of the court holds that the commission cannot order FirstEnergy to refund any REC costs that were recovered before the commission issued its audit order, even if the costs were imprudently incurred. That holding reduces the entire audit review of FirstEnergy's REC purchases to an exercise in futility. In effect, the commission and the parties needlessly went through more than two years of litigation at the commission when everyone involved should somehow have realized from the outset that FirstEnergy would be entitled to keep virtually all its REC costs, whether prudently incurred or not.
*310 The court is wrong to rely on the refund language of R.C. 4905.32
{¶ 88} The lead and concurring opinions also accept FirstEnergy's assertion that the plain language of R.C. 4905.32 bars any refund in this case because Rider AER did not specify a refund process. R.C. 4905.32 provides that "[n]o public utility shall refund or remit directly or indirectly, any rate * * * or charge * * * except such as are specified in [its] schedule * * *." Because no refunds or disallowances are specified in the commission-approved tariffs for Rider AER, FirstEnergy maintains that R.C. 4905.32 precludes the commission from ordering a refund of previously recovered REC costs in this case. In my view, reliance on this provision is erroneous.
{¶ 89} First, we lack jurisdiction over this issue. We have jurisdiction only over arguments raised in a party's application for rehearing at the commission. R.C. 4903.10 ; Ohio Consumers' Counsel v. Pub. Util. Comm. , 114 Ohio St.3d 340, 2007-Ohio-4276, 872 N.E.2d 269, ¶ 40. FirstEnergy did quote the refund language of R.C. 4905.32 in its application for rehearing before the commission. But FirstEnergy never made the specific argument on rehearing that it makes on appeal-that R.C. 4905.32 bars any refund in this case because Rider AER did not specify a refund process. And we have strictly construed the specificity requirement in R.C. 4903.10. See R.C. 4903.10(B) (application for rehearing "shall set forth specifically the ground or grounds on which the applicant considers the order to be unreasonable or unlawful"); see also Discount Cellular, Inc. v. Pub. Util. Comm. , 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 59. So FirstEnergy has forfeited any argument *20 based on the refund provision of R.C. 4905.32.
{¶ 90} Second, even if FirstEnergy had preserved this argument, it should not be relied on in this case. Under the filed-rate doctrine, the rates approved by and filed with the commission are the lawful rates, unless and until a litigant proves otherwise. See R.C. 4905.32 ; Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co. , 166 Ohio St. 254, 257-259, 141 N.E.2d 465 (1957) ; see also Lucas Cty. Commrs. v. Pub. Util. Comm. , 80 Ohio St.3d 344, 347, 686 N.E.2d 501 (1997) ("while a rate is in effect, a public utility must charge its consumers in accordance with the commission-approved rate schedule"). And although the commission has the power to invalidate a rate schedule and fix new rates, this authority is prospective only. See Ohio Util. Co. v. Pub. Util. Comm. , 58 Ohio St.2d 153, 158, 389 N.E.2d 483 (1979). The rule against retroactive ratemaking thus bars the commission from ordering a refund or otherwise adjusting current rates to make up for overcharges under previously approved rates. See In re Application of Columbus S. Power Co. , 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 15-16.
{¶ 91} But the commission's approval of Rider AER did not result in a final, approved rate, so the commission did not engage in retroactive ratemaking when *311 it disallowed over $43 million in REC costs. Because FirstEnergy could recover only prudently incurred REC costs under the ESP order, the Rider AER costs were subject to retrospective adjustment dependent on the outcome of the commission's prudence review. See, e.g., Cincinnati v. Pub. Util. Comm. , 67 Ohio St.3d 523, 527-528, 620 N.E.2d 826 (1993) (explaining that a review of a utility's decision to determine whether it was prudent contemplates a retrospective, factual inquiry, without the use of hindsight, into the decision-making process of the utility's management). Stated differently, the commission did not order a refund of a final, approved rate here because the rates charged in the Rider AER tariffs were never fixed. Rather, those rates were subject to postrecovery adjustment if the commission later determined that FirstEnergy had not made prudent REC purchases. In short, because the commission did not order a refund of lawfully recovered REC costs, any reliance on the refund provision of R.C. 4905.32 is misplaced.
{¶ 92} The lead and concurring opinions also err in treating this issue as settled law, when it clearly is not. They both construe the following language in R.C. 4905.32 to authorize a refund, so long as the refund is "specified" in the utility's schedules and evenly applied:
No public utility shall refund or remit directly or indirectly, any rate, rental, toll, or charge so specified [in its schedule filed with the Public Utilities Commission], or any part thereof, or extend to any person, firm, or corporation, any rule, regulation, privilege, or facility except such as are specified in such schedule and regularly and uniformly extended to all persons, firms, and corporations under like circumstances for like, or substantially similar, service.
The lead and concurring opinions adopt FirstEnergy's interpretation of the statute and conclude that R.C. 4905.32 precludes the commission from ordering FirstEnergy to refund previously recovered REC costs in this case because the tariff for the Rider AER does not specify a refund.
*21 {¶ 93} But both opinions fail to recognize that this sentence can be read more than one way. The sentence contains two prohibitions. No public utility shall (1) "refund or remit * * * any rate, rental, toll, or charge" or (2) "extend to any person, firm, or corporation, any rule, regulation, privilege, or facility." An exception directly follows the second prohibition: "except such as are specified *312 in such schedule and regularly and uniformly extended to all persons, firms, and corporations under like circumstances." There is no question that the exception, because of its placement, applies to the second prohibition-that is, no utility may extend a rule, regulation or privilege to any person "except such as are specified in such schedule and regularly and uniformly extended to all persons." The lead opinion and the concurring opinion construe the exception to also apply to the first prohibition-that is, a refund may occur only if "specified" in the schedule. To my knowledge, the court has never expressly considered whether the exception applies to both prohibitions. Despite the fact that this appears to be an issue of first impression, a majority of the court simply accepts FirstEnergy's interpretation.
{¶ 94} But even if this interpretation of R.C. 4905.32 is correct, FirstEnergy should not be able to benefit from the fact that there was no refund language in Rider AER. Under the ESP order, the commission charged FirstEnergy with filing tariffs consistent with that order. 2009 WL 874475, 2009 Ohio PUC LEXIS 279 at *45 ; see R.C. 4905.30 (every public utility must apply for commission approval of tariff schedules that detail the rates, charges, and classifications of service). So FirstEnergy should not be able to rely on the absence of refund language in the Rider AER tariff to avoid having to repay REC costs if those costs were imprudently incurred.
CONCLUSION
{¶ 95} For all these reasons, I would conclude that the commission did not engage in unlawful retroactive ratemaking. Having reached that conclusion, I would proceed to address FirstEnergy's second proposition of law, which challenges the commission's findings that the specified REC purchases made in 2010 were imprudent, and I would also address the additional propositions of law raised in the cross-appeal in this case that a majority of the court does not consider. Because a majority of this court has determined otherwise, I respectfully dissent.